IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Quality Driven Copack, Inc.,                :
                   Petitioner        :
                                   :
                   v.        :          No.  862 F.R. 2013
                                   :
Commonwealth of Pennsylvania,        :
                   Respondent        :


Quality Driven Copack, Inc.,                :
                   Petitioner        :
                                   :
                   v.        :          No. 879 F.R. 2013
Commonwealth of Pennsylvania,        :          Argued:  October 21, 2021
                   Respondent        :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE J. ANDREW CROMPTON, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CROMPTON            FILED:  December 29, 2021

          Before this Court is the petition for review of Quality Driven Copack, Inc. (Taxpayer) from the September 24, 2013 Orders (Orders) of the Board of Finance and Revenue of the Commonwealth of Pennsylvania (BFR).  The Orders (1) denied Taxpayer's appeals of denials from the Pennsylvania Department of

Revenue's Board of Appeals (Appeals Board)[1] of Taxpayer's petitions in which Taxpayer sought a review of the sales and use tax assessed against it and (2) denied a refund of alleged tax overpayments made as a result of a Pennsylvania sales and use tax audit for the period January 1, 2007, to June 30, 2010.[2]

## I. Background and Procedural History

[Taxpayer] is a Pennsylvania corporation engaged in [the] business of assembling, and then selling at the wholesale level, pre-cooked frozen ingredients into frozen sandwiches, entrees, and bowl/bag type meals.
. . . .
[Taxpayer] was the subject of a Pennsylvania sales and use tax audit for the period January 1, 2007 to June 30, 2010. Pursuant to that audit, [Taxpayer] was issued the following assessment: Pennsylvania Use Tax $1,219,541.68, Allegheny County Use Tax $2,560.91, Philadelphia County Use Tax $156,090.50, Penalty $413,457.72, [and] Interest $175,212.04, for a total assessment of $1,966,862.85. The [Appeals Board] sustained the tax portion of the assessment, with interest, in its entirety. All assessed penalties were abated . . . .

To create its product, [Taxpayer] purchases the food components and packaging materials, blends the components into meals, packages them into various types of containers, and then freezes them to complete the process . . . .

[Taxpayer] claims that it is engaged in manufacturing and processing for sales and use tax purposes in Pennsylvania as defined in 72 P.S.

---

[1] The Department of Revenue's website provides the following concise and convenient explanation of the role of the Appeals Board and the BFR: "The [Appeals Board] was established to review initial actions taken by the Department of Revenue against a taxpayer (such as an assessment); requests for refunds submitted by taxpayers; denials of property tax rent rebate claims and charitable exemptions . . . . For all taxes, if you disagree with the Board's order, an appeal may be filed with the [BFR]." https://www.revenue.pa.gov/GetAssistance/appeals/Pages/default.aspx (last visited on Dec. 28, 2021).

[2] The BFR issued a Decision and Order, at BFR Docket Number 1201689, in regard to Taxpayer's Petition relative to review of the sales and use tax assessment. A separate Decision and Order, at BFR Docket Number 1201690, was issued relative to Taxpayer's Petition seeking a refund of alleged sales and use tax overpayments.

7201(c) and (d)[3] and 61 Pa. Code §32.1.[4] Therefore, [Taxpayer] contends that it should not have been assessed use[] tax on machinery

---

[3] These are references to sections of the Tax Reform Code of 1971 (Tax Code), Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§7101-10004. Section 201(c) states, in pertinent part:

> **(c)** **"Manufacture."** The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not be limited to--
> (1) Every operation commencing with the first production stage and ending with the completion of tangible personal property having the physical qualities (including packaging, if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another . . . .
> The term "manufacture" shall not include constructing, altering, servicing, repairing or improving real estate or repairing, servicing or installing tangible personal property, nor the producing of a commercial motion picture, nor the cooking, freezing or baking of fruits, vegetables, mushrooms, fish, seafood, meats, poultry or bakery products.

Section 201(d) states, in pertinent part:

> **(d)** **"Processing."** The performance of the following activities when engaged in as a business enterprise:
> (1) The filtering or heating of honey, the cooking, baking or freezing of fruits, vegetables, mushrooms, fish, seafood, meats, poultry or bakery products, when the person engaged in such business packages such property in sealed containers for wholesale distribution . . . .
> (1.1) The processing of fruits or vegetables by cleaning, cutting, coring, peeling or chopping and treating to preserve, sterilize or purify and substantially extend the useful shelf life of the fruits or vegetables, when the person engaged in such activity packages such property in sealed containers for wholesale distribution.
>  . . . .
> (9) The milling for sale of flour or meal from grains.
> . . . .
> (13) The cooking or baking of bread, pastries, cakes, cookies, muffins and donuts when the person engaged in such activity sells such items at retail at locations that do not constitute an establishment from which ready-to-eat food and beverages are sold.

3

and equipment, and repair parts and services to such machinery and equipment, which is directly used in manufacturing/processing operations pursuant to 61 Pa. Code §32.32(a)(1).[5] In addition to its

(14)    The cleaning and roasting and the blending, grinding or packaging for sale of coffee from green coffee beans or the production of coffee extract.
. . . .
(16)    The production, processing and packaging of ice for wholesale distribution.

[4] 61 Pa. Code §32.1 states, in pertinent part:

Manufacturing--The performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired whether for sale or use by the manufacturer. The change in form, composition or character shall result in a different product having a distinctive name, character and use. Operations such as compounding, fabricating or processing are illustrative of the types of operation which may result in a change although any operation which has that result may be manufacturing. Mere changes in chemical composition or slight changes in physical properties are not sufficient. For example, the C Company, as its business operation, takes coffee beans and thereafter, by mechanical and hand labor cleans them, removes the outer skins and roasts the beans. The roasted coffee, resulting from the C Company's activities, is not a manufactured product, notwithstanding the fact that there has been a change in color, weight and size of bean
. . . .
Processing--The following operations when engaged in as a business enterprise have been defined by the General Assembly as processing:
(i) The cooking or freezing of fruits, vegetables, mushrooms, fish, seafood, meats or poultry, when the person engaged in business packages such property in sealed containers for wholesale distribution . . . .
(ix) The milling for sale of flour or meal from grains.

[5] 61 Pa. Code §32.32(a)(1) states, in pertinent part:

Section 32.32 - Manufacturing; processing (a) Equipment, machinery, parts and foundations therefor and supplies used directly in manufacturing or processing. The purchase or use of tangible personal property or services performed thereon by a person engaged in the business of manufacturing or processing is exempt from tax if the property is predominantly used directly by him in manufacturing or processing operations . . . . (1) Direct use. In determining whether property is directly used, consideration shall be given to the following factors: (i) The physical

manufacturing arguments, [Taxpayer] further claims that the auditor erroneously assessed use tax on a variety of expense transactions, including certain services that it claims were erroneously characterized as help supply services. [Taxpayer] also asserts that the auditor did not give proper credit tax [for] payments on equipment leases.

[Taxpayer] made all of the above arguments to the [Appeals Board] in an appeal filed January 25, 2012. Since the appeal did not contain an appeal schedule of contested items[] or any other documentation, the [Appeals] Board made a request for information to support the appeal on June 15, 2012. When [Taxpayer] failed to respond to the request, the [Appeals] Board [i]ssued a decision sustaining the tax deficiencies with [i]nterest (as stated, all penalties were abated) . . . .

BFR Dec. and Order, BFR Docket No. 1201689, 9/24/13, at 2.

Taxpayer appealed the above-referenced Appeals Board decision, along with the Appeals Board decision denying Taxpayer's request for relief for taxes that were allegedly overpaid, to the BFR, asserting it was entitled to relief under the manufacturing exemption of the Tax Code. Taxpayer also asserted that the Commonwealth was in violation of various clauses of the Pennsylvania and United States Constitutions, as well as the Pennsylvania Taxpayers' Bill of Rights, and thus, Taxpayer was entitled to attorney's fees. In its Decisions, the BFR noted that Taxpayer stated it would provide the BFR with "descriptions of use, invoices, and proof of payment prior to hearing" and that Taxpayer's appeal petition (relative to BFR Docket No. 1201689) "was not filed with an appeal schedule of contested transactions and supporting information"; however, no such information was ever provided. BFR Dec. and Order, BFR Docket No. 1201689, 9/24/13, at 2-3 and BFR Dec. and Order, BFR Docket No. 1201690, 9/24/13, at 2.

proximity of the property in question to the production process in which it is used. (ii) The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process. (iii) The active causal relationship between the use of the property in question and the production of a product . . . .

5

After review of Taxpayer's appeals, the BFR concluded that Taxpayer was not entitled to relief under the arguments it made in its petitions. In addition, to the extent Taxpayer did not provide the Appeals Board or the BFR with any supporting information/documentation, the BFR determined it did not have anything to review to determine if Taxpayer had "erroneously paid tax" or "was erroneously assessed." BFR Dec. and Order, BFR Docket No. 1201689, 9/24/13, at 3; BFR Dec. and Order, BFR Docket No. 1201690, 9/24/13, at 4. Further, the BFR determined it did not have the authority to "pass upon the validity or constitutionality of [the] law" or the authority to award attorney's fees. BFR Dec. and Order, BFR Docket No. 1201689, 9/24/13, at 4; BFR Dec. and Order, BFR Docket No. 1201690, 9/24/13, at 4. Thus, the BFR denied Taxpayer's appeal petitions. Taxpayer subsequently filed Petitions for Review[6] with this Court. After a number of requests for extensions of time, representations of ongoing settlement discussions, and the agreement of the parties on a number of stipulations of fact,[7] the matter now comes before this Court

_____

[6] Taxpayer filed two Petitions for Review: one seeking that the tax assessment be set aside and the other seeking a refund of taxes paid. Subsequently, the parties sought a consolidation of the two cases, and this Court filed an Order, on November 4, 2020, granting same.

[7] In July and October 2018, the parties agreed to a partial stipulation of facts and a supplemental stipulation of facts. On October 29, 2020, the parties reached another stipulation of facts, which incorporated the prior, partial stipulations. Notably, the following stipulations of fact, in pertinent part and verbatim (including changing and inconsistent verb tenses), except otherwise noted, were reached:

> 5.     During the audit and refund periods, [] Taxpayer assembled pre-cooked frozen and refrigerated ingredients[,] put together frozen sandwiches, entrees, bowls and bag-type meals. All components were purchased pre-frozen or refrigerated with the exception of sauces and gravies, some of which were made from scratch and some made from bagged mixes. The Department of Revenue auditor considered the creation of sauces and gravies onsite a manufacturing activity, and therefore, mixing equipment was considered excluded from tax and not assessed.

6.      [T]here are [four] production lines described as follows:

a.      Room 1 – Biscuit/Sandwich Line

Biscuits, bread or buns, which could be frozen or refrigerated are fed into splitters to separate the bread into halves.  By hand, workers insert pre-cooked frozen sausage patties and refrigerated sliced cheese and/or ham or bacon between the split biscuits, bread or buns.  By hand, the workers inserted the sandwiches onto the lugs of the doughboy wrapping/sealing machines, which sealed them, and which were then inserted into the automatic cartoners.  For other sandwiches, equipment deposited refrigerated chili on refrigerated hot dogs or barbeque sauce was deposited on frozen ribette sandwiches.  The product was moved along the line using some conveyors, inserters and stationery worktables.  Finished products were stored in freezers until shipping.

b.      Room 2 – Casserole/Dinner Line

Frozen chicken and noodles were manually placed into individual meal trays with refrigerated Alfredo sauce which was automatically injected by piston fillers over the components.  The package then travels down a belt where it is sealed with a sealing machine, and into the cartoner machine and placed into retail cartons; sealed again, placed into cases and then stored in freezers.

c.      Room 3 – Bagged Skillet Meals, Pancake/French Toast Meals Line

Frozen meats, pasta, vegetables and sauce pellets were placed in bins, fed into compartments in a vertical conveyor for the proper mix and portion size; seasonings were applied and then the meals were fed into plastic retail product bags that are formed out of bag stock in gusseted bags on a vertical form and fill machine. Products and portions were weighed during assembly.  Bags were sealed on the sealing machine and boxed and then stored in a freezer until shipment.   The following are examples of products on this line: 1. Chicken Alfredo Skillet . . . . 2. Rib and Salisbury Dinners . . . .

d.      Room 4 – Breakfast Bowl Line

The breakfast bowl meals contained layered components which include both frozen items such as potatoes, sausage/bacon, eggs, and refrigerated items such as cheese, gravies or sauces.  Frozen pre-cooked ingredients were loaded into bins and cone-shaped fillers to disperse specific layered portion of components into bowls.  Depending on the product, water and/or spices may be injected via automatic air driven sprayers into the bowl.  Precooked frozen and refrigerated ingredients are loaded into bins and into rotary dial fillers, rotary fillers and piston fillers to be dispersed into the bowls.  The bowls travel down a production belt cavities [sic] that transport them through sealing heads which place a seal over the bowls and then they are automatically cut by blades.  Further down the line, the bowls go through check weighers and metal detectors and onto the belt of an automatic cartoner, where a retail carton is automatically formed [and] placed over them. After that, the bowls then travel onto an automatic case packer, where the

7

bowls are segregated and collated and put into a corrugated shipping container, which is stamped into the shape of a box by the machine, which is a Douglas Case Wrapper. The product then is date coded, automatically labeled and placed onto pallets that are automatically shrink wrapped. The cartons were placed into case packaging, placed onto pallets and then stored in freezers until shipment.

. . . .

8. Property on which tax was assessed or on which tax was paid includes conveyors, belt feeders, scales, packaging equipment (such as cartoners, sealers, case packers), product line equipment (such as scales, fillers, hoppers) refrigeration equipment and racking inside refrigeration units, ink for printers, trailer rentals used to store and ship products.

9. During the audit and refund periods, [] Taxpayer used laborers, including those who were foreign-born, supplied through various staffing contractors, to work on the product lines.

10. On those staffing transactions where sales tax was not charged and collected by the staffing contractors, the auditor assessed use tax.

11. Pursuant to the agreements between [] Taxpayer and the staffing contractors, "supervision" is defined as follows:

> [The staffing contractor] shall provide supervision for the workers it assigns to [Taxpayer]. The supervisor(s) shall work with [Taxpayer] in training [the staffing contractor's] workers [to] follow [Taxpayer's] policies and procedures. [The staffing contractor's] supervision of its workers shall also include providing interpretation services for any worker placed at [Taxpayer] who does not speak fluent English. The supervisor shall work and be paid as a regular line employee . . . .

12. Taxpayer's plant manager oversees all activities related to the plant, including meeting with staffing contractor's personnel, overseeing shipping and purchasing, and meeting with the government agencies that monitor [Taxpayer's] production process.

13. The staffing contractor's supervisors report directly to the staffing contractor's lead manager.

14. The staffing contractors train employees to follow guidelines ranging from dress requirements to food handling.

. . . .

16. After Taxpayer establishes a program for a particular product, the staffing contractors and their supervisors perform the following:

a. Determine the number of shifts and shift hours to maintain production.

b. Determine the number of employees needed to work in the production line per shift.

8

for our review.[8]

## II. Arguments

## A. Taxpayer's Arguments

Taxpayer argues that it is entitled to a refund and reversal of the tax assessment against it because it is a manufacturer as defined in Pennsylvania law

---

c.     Ensure employees hit production goals set by and regularly reviewed by [] Taxpayer.

d.     Inspect the production lines through the process throughout each day of production.

e.     Prepare production reports which are regularly reviewed by [] Taxpayer . . . .

17.     Quality control is [Taxpayer's] responsibility. [Taxpayer] employs directors and techs to oversee quality control.

18.     [Taxpayer] has the right to replace any employee of the staffing contractors who underperforms or does not follow established safety and sanitary guidelines. In most cases, however, the staffing contractors are aware of employee problems and take the necessary steps to remove the employee before [Taxpayer] requests such removal.

19.     In No. 879 F.R. 2013, [] Taxpayer appealed the audit assessment. In No. 862 F.R. [2013], [] Taxpayer appealed the refund for which [] Taxpayer has requested a refund of the exact same transactions that were assessed. Because [] Taxpayer has not established that tax was paid on those transactions, the [p]arties stipulate and agree that to the extent this Court determines [] Taxpayer is entitled to [] relief, these matters will be remanded to the [BFR] for confirmation of proof of payment in the refund appeal and for a calculation of the amount of the refund owed to [] Taxpayer and tax reduction in the assessment.

Stipulation of Facts, 10/29/20, Appendix A to Commonwealth's Br. filed with this Court on 5/20/21.

[8] "Although on appeal from the actions of most administrative agencies judicial discretion may not be substituted for administrative discretion absent bad faith, capricious action, or abuse of power by the administrative agency, this standard does not apply to our review of decisions of the [BFR]. [Pennsylvania] Rule of Appellate Procedure, Pa. R.A.P. 1571 [(relating to Determinations of the BFR)], authorizes this Court to rule on the record made before it or on the stipulation of facts made by the parties." *Norris v. Commonwealth*, 625 A.2d 179, 182 (Pa. Cmwlth. 1993) (internal citation omitted). Although this Court considers the propriety of a BFR order within its appellate jurisdiction, it functions essentially as a trial court. *Id.*

and thus entitled to the applicable exemption from taxation for same. Taxpayer explains that it "combines numerous ingredients to create prepackaged meals, including skillet meals, breakfast cups, dinners and sandwiches" and that it "utilizes its skill and expertise, as well as a complex assortment of equipment, to turn various ingredients into something new and useful, namely frozen, ready[-]to[-]cook meals." Taxpayer's Br., 4/20/21, at 11. Taxpayer adds that "[w]hat entered [its] facility as individual ingredients were transformed into prepackaged meals that could easily be sold for resale, and quickly prepared and consumed by the end user." *Id.*

Taxpayer asserts that "[t]he [p]rimary issue to address in the instant matter is whether [its] activities qualify for [a] manufacturing and processing exemption." Taxpayer's Br., 4/20/21 at 12. Taxpayer states that "[p]rocessing includes 'the cooking or freezing of fruits, vegetables, mushrooms, fish, seafood, meats or poultry, when the person engaged in business packages such property in sealed containers for wholesale distribution.'" Taxpayer's Br., 4/20/21, at 12 (quoting 61 Pa. Code §32.1). Taxpayer notes that the term "manufacture" is defined as: "The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer . . . ." Taxpayer's Br., 4/20/21, at 12 (quoting 72 P.S. §7201(c)).

Taxpayer argues that "[t]he definition of 'manufacturing' has been well summarized by the Pennsylvania Courts in various cases" and that our Supreme Court, in *Philadelphia School District v. Parent Metal Products, Inc.*, 167 A.2d 257, 258-59 (Pa. 1961), stated that manufacturing

> [c]onsists in the application of labor skill to material whereby the original article is changed into a new, different and useful article . . . [.]

10

> Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged . . . [.] If there is merely a superficial change in the original materials, without any substantial and well signalized transformation inform [sic], qualities and adaptability in use, it is not a new article or new product.

Taxpayer's Br., 4/20/21, at 12-13 (quoting *Parent Metal Products*, 167 A.2d at 258-59).

Taxpayer argues that, here, "the materials utilized in [its] manufacturing process, while initially various food items, were transformed by [] [its] manufacturing process into a full meal, ready for quick preparation and consumption by the end user." Taxpayer's Br., 4/20/21, at 15. As Taxpayer further notes, it is through its skill and labor that the original food items are transformed into a prepackaged ready-to-cook meal. Taxpayer contends that after this process, those original food items are in a final, usable form and can no longer by deconstructed into their original, individual components. Taxpayer argues that it uses its skill and technical expertise to blend ingredients for sauces and gravies, sprays ingredients, such as corn, with water and margarine to add to potato mixes, shreds cheeses and adds those cheeses to various products, and adds proteins to various meals before sealing and packaging the meals for the end consumer.

Taxpayer maintains that case law makes it clear that "there does not have to be a change in the composition of the components making up a product for the activity to be considered manufacturing" and that by taking "various materials and converting them into prepackaged food products ready for distribution and consumption," Taxpayer is engaged in manufacturing, which is exempt from taxation. Taxpayer's Br., 4/20/21, at 19. In support of this contention, Taxpayer asserts that the Department of Revenue's position that Taxpayer is simply combining

11

food items and that this is not manufacturing, is not the proper analysis. To illustrate its point, Taxpayer references the cases of *Edwin Bell Cooperage Co. v. Pittsburgh*, 112 A.2d 662 (Pa. Super. 1955), and *Koolvent Aluminum Awning Co. v. Pittsburgh*, 142 A.2d 428 (Pa. Super. 1958). In *Edwin Bell Cooperage Co.*, the assembly of kegs and barrels from existing parts was determined to be manufacturing. Quoting from the opinion, Taxpayer states: "'the finished keg or barrel is a permanent structure. Its parts are not interchangeable and cannot be taken apart and reassembled.' Thus[,] a new product is made out of existing materials which in combination are changed into an article with a distinctive character and use." Taxpayer's Br., 4/20/21, at 18 (quoting *Edwin Bell Cooperage Co.*, 112 A.2d at 664). In *Koolvent Aluminum Awning Co.*, the Pennsylvania Superior Court determined that turning aluminum sheets into awnings was manufacturing because it made the aluminum into "a new and different article with a distinctive name, character and use," and "it brings about the production of some new article by the application of skill and labor to the original substance or material out of which such new product emerges." Taxpayer's Br., 4/20/21, at 18 (quoting *Koolvent Aluminum Awning Co.*, 142 A.2d at 433). In its June 2, 2021 reply brief, Taxpayer asserts that its activity is "no different than that of an automobile manufacturer, which acquires components from a variety of sources and assembles them to create an automobile. [Taxpayer's] products start as bulk materials and end as readymade meals which the consumer can quickly prepare and consume." Taxpayer's Reply Br., 6/2/21, at 7-8.

Taxpayer next contends that the contract labor that it utilized during the audit period was not "help[ ]supply" and thus is exempt from taxation. *Id*. The use of help supply services is subject to sales and use tax. The Tax Code defines these services, in pertinent part, as

12

> [p]roviding temporary or continuing help where the help supplied is on the payroll of the supplying person or entity, but is under the supervision of the individual or business to which help is furnished. Such services include, but are not limited to, service of a type provided by labor and manpower pools, employe[e] leasing services, office help supply services, temporary help services, usher services, modeling services or fashion show model supply services.

72 P.S. §7201(cc). Taxpayer contends that the critical determination here is who had supervision and control of the labor force. Taxpayer asserts that (1) it used labor supplied by third parties at its plants, (2) it did not supervise this labor, and (3) the labor force, itself, determined how the work would be performed. Taxpayer states that it exercised no control or supervision of this labor force and that the matters of supervision and control were addressed in its contracts with the agency providing the staffing. Taxpayer's Br., 4/20/21, at 20. In addition, Taxpayer notes that an affidavit from a supervisor and employee of one of its staffing contractors stated that Taxpayer did not exercise control or provide instructions as to how the contractor's services were to be rendered in producing Taxpayer's products. Taxpayer's Reply Br., 6/2/21, at 11.

Accordingly, Taxpayer requests this Court reverse the Orders of the BFR which affirmed the Appeals Board and direct that Taxpayer be issued a refund in the amount of $1,455,249.00.[9]

### B. Commonwealth's Arguments

The Commonwealth argues that the Tax Code imposes a very specific and limited definition of the word "manufacture," which requires "a change in form,

---

[9] In its Petitions for Review, Taxpayer argues that the BFR Orders it is appealing involve violations of various rights under the Pennsylvania and United States Constitutions, as well as the Pennsylvania Taxpayers' Bill of Rights, and that it is entitled to attorney's fees. However, Taxpayer does not develop these same arguments in the briefs it filed with this Court. Thus, we do not address them herein. *See HPM Consulting v. Unemployment Comp. Bd. of Rev.*, 185 A.3d 1190 (Pa. Cmwlth. 2018) ("When a party appeals an administrative decision, but fails to address an issue in the brief, the issue is waived.").

composition and character of the raw materials that result in the end product. Here that standard is not met." Commonwealth's Br., 5/20/21, at 13. The Commonwealth contends that Taxpayer's packaging operation begins with pre-cooked frozen foods and ends with the same. The Commonwealth further contends that the fact that some ingredients start as refrigerated and end as frozen does not change the result, and the act of combining food ingredients into a ready-to-eat meal does not meet the Tax Code's definition of manufacturing. The Commonwealth asserts: "Because there is no change in form[,] composition and character of the pre-cooked frozen food and refrigerated ingredients when they are packaged into a frozen meal, [Taxpayer's] packaging operation is not manufacturing." Commonwealth's Br., 5/20/21, at 13.

The Commonwealth argues that a physical change in form, composition or character is missing from Taxpayer's packaging operation. In other words, there is no real difference between the food ingredients and the resulting packaged meal. The Commonwealth maintains that "[c]ombining frozen ingredients into a single package does not result in a different type of personal property, thus, the packaging operation does not qualify as manufacturing." Commonwealth's Br., 5/20/21, at 17. The Commonwealth asserts that Taxpayer's process, here, is unlike the process of making potato chips, for example, which was addressed in *Commonwealth v. Snyder's Bakery*, 35 A.2d 260 (Pa. 1944). In *Snyder's Bakery*, our Supreme Court determined that the process involved constituted manufacturing for mercantile license tax purposes because "[t]he raw potato is chemically changed from a starch to a sugar." Commonwealth's Br., 5/20/21, at 23. The Commonwealth states that, in reaching its determination, our Supreme Court noted that "the process of cleaning, slicing, drying and frying, the potato chip has no resemblance to a raw potato and is useful in that it is ready-to-eat without any further preparation. Because labor and

14

skill were applied to change the raw potato into a new, different and useful article, creating potato chips qualified as manufacturing." *Id.*

The Commonwealth asserts that in *Mack Trucks, Inc. v. Commonwealth*, 629 A.2d 179 (Pa. Cmwlth. 1993), this Court rejected an argument similar to the one being advanced by Taxpayer here when it held that combining and assembling various parts to create refurbished engines is not manufacturing for the purposes of assessing sales and use tax. Quoting *Marweg v. Commonwealth*, 513 A.2d 525 (Pa. Cmwlth. 1986),[10] the Commonwealth states:

> "If . . . there is merely a superficial change in the original materials or substances and no substantial and well-signaled transformation in form, qualities, and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged."

Commonwealth's Br., 5/20/21 at 18 (quoting *Marweg*, 513 A.2d at 527).

The Commonwealth cites a number of examples of cases in which various kinds of food processing have been determined not to be manufacturing. Of particular note, the Commonwealth cites *Commonwealth v. Berlo Vending Co.*, 202 A.2d 94 (Pa. 1964), regarding the franchise tax, which determined that combining coconut oil, salt, and popping corn to make popcorn, which was subsequently packaged in air-tight bags, was not considered manufacturing. The Commonwealth also cites *Van Bennett Food Co. v. Reading*, 486 A.2d 1025 (Pa. Cmwlth. 1985), a case involving the business privilege tax, in which it was determined that cutting, chopping and dicing ingredients, blending them in prepared dressing and packaging them to make coleslaw, pepper cabbage, salads, and relish was not manufacturing. In addition, the Commonwealth cites *Commonwealth v. Tetley Tea Co.*, 220 A.2d

---

[10] In *Marweg*, this Court determined that converting water into ice is not manufacturing for the purposes of the use tax in the Tax Code.

832 (Pa. 1966), another case involving the franchise tax, in which the separation of tea from foreign matter, blending the tea, and placing precise amounts in specially designed bags was not manufacturing because "the process starts and ends with tea." Commonwealth's Br., 5/20/21, at 24. The Commonwealth argues that Taxpayer's "operation involves far less change than those operations," and "[i]f the operations in the preceding cases are not manufacturing, then surely merely assembling pre-cooked frozen and refrigerated food ingredients in a package is not manufacturing . . . ." Commonwealth's Br., 5/20/21, at 25.

In addition, the Commonwealth refutes Taxpayer's position that a complicated process requiring complex equipment and skill, along with labor and expertise, must be manufacturing. Citing *Marweg*, 513 A.2d at 527, the Commonwealth states that the complexity of the operation and need for large plants and intricate machinery have no legal significance in determining whether an operation qualifies as manufacturing. Commonwealth's Br., 5/20/21, at 25. The Commonwealth asserts:

> The emphasis by the courts in sales and use tax cases . . . is on whether there is sufficient change in form, composition or character between the original tangible personal property and the final product. In [Taxpayer's] case, there is no change beyond the slightest superficial one that brings about the frozen meals.

Commonwealth's Br., 5/20/21, at 26.

In addition, the Commonwealth argues that the services provided by Taxpayer's staffing contractors are taxable help supply services because Taxpayer retained control over the production operation and employed a plant manager to oversee all activities of the plant. The Commonwealth contends that this type of general supervision meets the Department of Revenue's definition of same, and therefore, Taxpayer's purchases of services from staffing contractors are taxable

help supply services. The Commonwealth notes that "[t]he Department's Pronouncements – Statements of Policy define 'help supply services' as 'providing of an individual by a vendor to a purchaser whereby the individual is an employe[e] of the vendor and the work performed by the individual is under the supervision of the purchaser.' 'Employee' means '[a] person who is paid for his work or services by a vendor, including persons on the payroll or independent contractors.'" Commonwealth's Br., 5/20/21, at 28 (citing 61 Pa. Code §60.4(a)).

The Commonwealth asserts that Taxpayer entered into agreements with several staffing contractors to provide workers for its production lines. These workers were not Taxpayer's employees. Thus, the Commonwealth argues that the question for determining the taxability of the services is whether the workers were under Taxpayer's supervision. As the Commonwealth acknowledges, the statute does not define "supervision." Commonwealth's Br., 5/20/21, at 29. The Commonwealth stresses that Taxpayer "retained control over the entire production process." Commonwealth's Br., 5/20/21, at 30. Specifically, the Commonwealth states that Taxpayer employed its own staff, including a plant manager to oversee all plant activities, monitor production, and meet with the staff of its various contractors. The Commonwealth adds that Taxpayer directed and controlled the production process, set and reviewed production goals, reviewed production reports, and oversaw quality control. In addition, Taxpayer had the right to replace underperforming workers of the contractors or those who did not follow safety and sanitary guidelines. The Commonwealth notes that the staffing contractors' supervisors worked on the production lines and were paid as regular line employees, suggesting limited oversight and lack of complete authority over the workers that the contractors provided to Taxpayer. Commonwealth's Br., 5/20/21, at 31. The

Commonwealth notes that "the supervision of the help supply services provision has not been analyzed by [the] Pennsylvania courts." *Id.* In this regard, the Commonwealth cites a case from Texas, *Allstate Insurance Company v. Hegar*, 484 S.W.3d 611, 628-29 (Tex. App. 2016), in which the court determined that Allstate met the supervision requirement where it "exercised general supervision to ensure that the contract was adhered to and the desired results of the agreement were met." Commonwealth's Br., 5/20/21, at 32-33. The Commonwealth contends that Taxpayer's supervision of the contractors' staff satisfied the requirements of the Tax Code here, and thus, the services purchased from the staffing contractors were taxable as help supply services.

In addition, the Commonwealth contends that Taxpayer is not entitled to a refund in connection with staffing contractor services and equipment purchases. The Commonwealth notes that the parties stipulated that "to the extent this Court grants [Taxpayer] relief, the matters should be remanded to the [BFR] to confirm proof of payment and to calculate the amount of the refund and tax reduction in the assessment." Commonwealth's Br., 5/20/21, at 34.

In sum, the Commonwealth requests that this Court affirm the Orders of the BFR and declare that Taxpayer is not entitled to a refund or any reduction in the assessment against it.

### III. Discussion

We first address Taxpayer's contention that it is a manufacturer engaged in manufacturing for purposes of the sales and use tax in the Tax Code. Both Taxpayer and the Commonwealth provide us with a plethora of cases, which have analyzed this issue for various products, in various industries, for us to conduct a compare and contrast type analysis. In so doing, we acknowledge that the

18

distinctions are often very narrow and substantially involve a detailed, fact-intensive review. With that as our premise, we conclude that Taxpayer is not a manufacturer engaged in manufacturing here for purposes of a sales and use tax exemption as contemplated by the Tax Code.

Although it is true that Taxpayer takes individual food products and transforms them into prepackaged, ready-to-use, full meals, this process does not result in the kind of substantive change necessary to qualify for the tax exemption it seeks. Succinctly put, Taxpayer's business is very similar to the company making popcorn in *Berlo Vending Co.*, which combined coconut oil, salt, and popping corn to make popcorn, that was subsequently packaged in air-tight bags, or the company in *Van Bennett Food Co.*, which cut, chopped, and diced ingredients, and blended them in prepared dressing before packaging the ingredients to make coleslaw, pepper cabbage, salads and relish. Taxpayer's operation is also similar in nature to the taxpayer in *Tetley Tea Co.*, in which the company there was engaged in separating tea from foreign matter, then blending the tea and placing precise amounts in specially designed bags. In all of the foregoing cases, our courts determined that the process at issue was not manufacturing for purposes of the Tax Code. Taxpayer's preparation of ready-to-eat meals, here, is little different.[11] In contrast, Taxpayer's operation is much less similar to the processes addressed in *Koolvent Aluminum Awning Co.*, *Edwin Bell Cooperage Co.*, or *Snyder's Bakery*, which, in each case, resulted in a more pronounced and lasting change to the starting material(s) and which were, thus, determined to be manufacturing for Tax Code purposes. Accordingly, we affirm the Orders of the BFR denying Taxpayer's appeals, to the

---

[11] It is also important to reiterate, as noted by the parties in their Stipulation of Facts, that the Department of Revenue's auditor considered Taxpayer's creation of sauces and gravies onsite to be a manufacturing activity, and therefore, mixing equipment was excluded from the amount of tax that was assessed.

19

extent they assert that the activities at issue here are manufacturing for purposes of a sales and use tax exemption.

We next address whether Taxpayer utilized help supply services in the production of its products. In addition to the above-referenced definition of help supply services in the Tax Code, 72 P.S. §7201(cc), 61 Pa. Code §60.4(a)(ii) defines "help supply services," in pertinent part, as follows:

> Help supply services (a) *Definitions.* The following words and terms, when used in this section, have the following meanings, unless the context clearly indicates otherwise:
>
> *Employe*-A person who is paid for his work or services by a vendor, including persons on the payroll or independent contractors.
> . . . .
>
> *Help supply service*-The providing of an individual by a vendor to a purchaser whereby the individual is an employe of the vendor and the work performed by the individual is under the supervision of the purchaser.
> . . . .
>
> *Supervision*-Directing the work activities of the vendor's employe either directly or through a supervisor provided by the vendor.

The plain reading of the regulation is clear that supervision of the vendor's employees may be direct or through a supervisor provided by the vendor, but in the latter case, the vendor-provided supervisor must be implementing directions of the purchaser, not simply directing the activities as he sees fit. Here, based on the Stipulation of Facts between the parties, each vendor provided direct supervision of its employees, but Taxpayer retained the overall authority. Taxpayer had responsibility for quality control, employed its own employees to oversee that quality control, and had the right to replace any employee of the staffing vendor who underperformed or did not follow established safety and sanitary guidelines.

20

To support its position on the help supply issue, Taxpayer presented the June 30, 2018 affidavit of Boyke Budiarachman (Budiarachman) who was a supervisor for one of the vendors [Vendor] that provided labor to Taxpayer. Budiarachman attested he was present at Taxpayer's facility at various times between January 1, 2007, and June 30, 2010. In his affidavit, he further stated:

> 5. As a supervisor, I ran the floor for the services being provided [] to [Taxpayer].
> 6. Representative of [Taxpayer] did not control the methodology or manner in which [Vendor] and its employees would perform their contractual obligations.
> 7. In fact, [Taxpayer] would inform me, as supervisor, of the nature of the products that were to be manufactured in its facility and the location in the facility in which the services were to be provided. After providing such information, [Taxpayer] provided no further instruction . . . .
> 8. Additionally, nearly all of the employees of [Vendor] present at the facility of [Taxpayer], other than myself, did not speak English, and as such, all instruction to [Vendor's] workers came from me.
> 9. During my time as an employee of [Vendor], [Taxpayer] always paid the full amount of any invoice submitted to it within payment terms, including any taxes included on any such invoice.

Affidavit of Boyke Budiarachman, Exhibit I, Attached to Supplemental Stipulation of Facts filed with this Court on 10/2/2018.

In addition, Taxpayer presented the August 21, 2018 affidavit of its vice president, David Barbe, who attested, in pertinent part as follows:

> 9. In order to perform the manufacturing function for each of the meals described, [] Taxpayer entered into contracts with various labor suppliers. As is typical of all of the labor contracts entered into by [] Taxpayer, the contract provides that the company providing the labor will be in control of the manner in which the work will be performed.
> 10. [] Taxpayer at no point controls the labor force provided by the company with which it contracts, and in fact, is unable to communicate with nearly all of the employees as they speak a language other than English.

21

11. In fact, [] Taxpayer would merely inform the supervisor of the company providing the labor, the nature of the products being manufactured, and the location at the facility where the work will take place.

12. After providing such information, [] Taxpayer provided no further instruction to or direction to the company providing the labor and exercised no control over the individuals supplied to aid with the manufacturing process.

13. [] Taxpayer made numerous tax payments regarding the labor it obtained from third parties.

. . . .

15. [] Taxpayer is entitled to a refund on the amounts paid concerning labor it contracted for in the amount of $538,442.00.

. . . .

18. It is my belief that the assessment of the Commonwealth in this case is improper and items which were the subject of the assessment were not taxable.

19. [] Taxpayer made payments to the Department of Revenue on behalf of the labor company, which [] Taxpayer does not believe it should have made.

Affidavit of David Barbe, Exhibit H, Attached to Supplemental Stipulation of Facts filed with this Court on 10/2/2018.

As the customer, the taxpayer that contracts with a third party for labor seemingly always retains the ultimate authority over the manufacturing process. The distinction in each case is the actual degree of authority exercised by the taxpayer. Thus, every scenario requires its own analysis. This analysis must include a close assessment of the degree of ground-level direction provided by the contractor versus the level of direction retained by the subject taxpayer/manufacturer. Here, Taxpayer's largely unrebutted affidavits support the position that its contractors worked independently on the plant floor with very little hands-on oversight by Taxpayer. Accordingly, we cannot say that Taxpayer provided the requisite level of direction for the third-party labor services to be considered help supply services as defined, and thus, we cannot say Taxpayer was required to pay tax on those services.

Therefore, we reverse the BFR's determination that sales and use tax was properly assessed on Taxpayer relative to the use of help supply services and that Taxpayer was not entitled to relief in the form of a refund. As a result, it is necessary for us to remand this matter to the BFR to determine what amount, if any, Taxpayer was assessed in sales and use taxes relative to help supply services and to refund any amount of overpayment in this regard.

## IV. Conclusion

For the foregoing reasons, we affirm the September 24, 2013 Orders of the BFR in part, and reverse them in part, and remand to the BFR.

 

 

 

_____
J. ANDREW CROMPTON, Judge

23

Quality Driven Copack, Inc., :
                Petitioner :
                 :
        v. : No.  862 F.R. 2013
                 :
Commonwealth of Pennsylvania, :
                Respondent :

Quality Driven Copack, Inc., :
                Petitioner :
                 :
        v. : No. 879 F.R. 2013
Commonwealth of Pennsylvania, :
                Respondent :

# **O R D E R**

**AND NOW**, this 29th day of December 2021, the September 24, 2013 Orders of the Board of Finance and Revenue (BFR) are **AFFIRMED** in part and **REVERSED** in part, and these matters are **REMANDED** to the BFR.  The Orders of the BFR relative to whether Quality Driven Copack, Inc. (Taxpayer) was engaged in manufacturing for purposes of a sales and use tax exemption are affirmed.  The Orders of the BFR are reversed to the extent they affirmed the imposition of sales and use tax against Taxpayer relative to the use of help supply services.  These matters are remanded to the BFR for a determination of the amount of sales and use tax assessed against Taxpayer for the employment of help supply

services and a determination of the amount of any such refund to which Taxpayer may be entitled for same, in accordance with the foregoing Opinion.

This Order shall become final unless exceptions are filed within thirty (30) days pursuant to Pa. R.A.P. 1571(i).

_____
J. ANDREW CROMPTON, Judge